IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAHAMUDUL HASAN,                         )
                                         )
    Petitioner,                          )
                                         )
    v.                                   )    1:25-cv-1408 (LMB/IDD)
                                         )
JEFFREY CRAWFORD, JOSEPH SIMON,          )
    KRISTI NOEM, and PAMELA BONDI,       )
                                         )
    Respondents.                         )

<u>MEMORANDUM OPINION</u>

    Petitioner Mahamudul Hasan ("Hasan"), a native and citizen of Bangladesh, has filed a five-count Petition for Writ of Habeas Corpus ("Petition") in which he asserts that he has been illegally detained by the U.S. Department of Homeland Security's ("DHS") Immigration and Customs Enforcement ("ICE") since July 22, 2025. Specifically, he alleges that DHS's invocation of the automatic stay pursuant 8 C.F.R. § 1003.19(i)(2) after an Immigration Judge ("IJ") ordered him released on bond is <u>ultra vires</u> (Count I) and violates his substantive and procedural due process rights (Counts II and III). He also alleges that DHS's characterization of Hasan as an "applicant for admission" pursuant to 8 U.S.C. § 1225(a), thus subjecting him to mandatory detention under § 1225(b)(2), violates the Immigration and Nationality Act ("INA") and the Administrative Procedure Act (Count IV) and his due process rights (Count V).

    Hasan is currently detained at the Farmville Detention Center ("FDC"), which is within this Court's jurisdiction and the basis upon which he is suing Jeffrey Crawford, the Warden of FDC. Hasan has also sued Joseph Simon, ICE Washington Field Office's Enforcement and Removal Operations Director; Kristi Noem, the DHS Secretary; and Pamela Bondi, the Attorney

General (collectively "federal respondents"). For the reasons discussed in this Memorandum

Opinion, the Court finds that Hasan is detained pursuant to 8 U.S.C. § 1226(a) and that the

automatic stay regulation, 8 C.F.R. § 1003.19(i)(2), violates due process. Accordingly, Hasan's

Petition will be granted as to Counts II, III, and V, and the respondents will be ordered to release

Hasan from custody.[1]

## I. BACKGROUND

Hasan was born on December 7, 1988, in Bangladesh. [Dkt. No. 1-5] at 1. On

November 4, 2024, he entered the United States through the San Ysidro Port of Entry without

inspection. Id. At 11:30 p.m. that day, Border Patrol agents encountered Hasan "in the San

Diego Border Patrol Sector's area of responsibility" and arrested him pursuant to a DHS

administrative warrant, which stated that Hasan was "within the country in violation of the

immigration laws and is therefore liable to being taken into custody as authorized by section 236

of the Immigration and Nationality Act."[2] Id. at 1–2; [Dkt. No. 1-7]. On November 5, 2024,

after Hasan informed the agents that Charlottesville, Virginia, was his intended destination, and

the agents determined that he did "not appear to be a threat to national security, border security,

or public safety," [Dkt. No. 1-5] at 2, DHS issued Hasan a Notice to Appear ("NTA")[3] and

released him from custody pursuant to an ICE Form I-200A Order of Release on Recognizance,

which provided that, "[i]n accordance with section 236 of the Immigration and Nationality Act

---

[1] Because the Court is granting relief on due process grounds, it need not address Hasan's
Administrative Procedure Act or INA claims or his argument that the automatic stay regulation is
ultra vires.

[2] Section 236 of the INA is codified at 8 U.S.C. § 1226.

[3] A Notice to Appear is a "[c]harging document" that "initiates a proceeding before an
Immigration Judge." 8 C.F.R. § 1003.13.

and the applicable provisions of Title 8 of the Code of Federal Regulations," Hasan was being released on his "own recognizance." [Dkt. No. 1-6].

Hasan moved to Charlottesville, where he began "establish[ing] friendships with students, artists, and fellow members of the Muslim community in Virginia." [Dkt. No. 1] at 6. On January 21, 2025, he filed a Form I-589, Application for Asylum and Withholding of Removal, with the Sterling Immigration Court in Virginia. Id. His asylum application is currently pending.

On July 8, 2025, Hasan was instructed to report to the Richmond ICE office for enrollment in alternatives to detention. Id.; [Dkt. No. 9] at 7. He complied and reported to the ICE office with counsel to meet with a case manager in the Intensive Supervision Appearance Program ("ISAP"). [Dkt. No. 1] at 6. The case manager advised Hasan that he would be required to wear an ankle monitor pursuant to DHS internal guidance.[4] Id. Hasan agreed to wear an ankle monitor, and the case manager placed it on his left leg and told him to return on July 22, 2025. Id. at 7.

On July 21, 2025, one day before Hasan's second ISAP appointment, he provided a note from a medical facility in Charlottesville to his ICE Deportation Officer explaining that he "has chronic nerve compression causing severe pain of the left foot" and requesting that "the monitor be removed due to his chronic nerve pain." Id.; [Dkt. No. 7-2]. The Deportation Officer did not

---

[4] According to Hasan, the case manager originally stated that an executive order required non-citizens to wear ankle monitors. [Dkt. No. 1] at 6. When Hasan's counsel inquired further, the case manager called someone from ICE, who explained that there was no such executive order, but that the ankle monitor was required pursuant to DHS internal guidance. Id. at 7.

respond to that note. [Dkt. No. 1] at 7.  On July 22, 2025, Hasan appeared for the scheduled

check-in appointment with the ISAP case manager, this time without counsel.  Id.

What happened at the second ISAP appointment is the subject of some dispute.

According to Hasan, he presented the medical note to an ISAP case manager, who "explained

that Mr. Hasan would need to keep his ankle monitor on," although "he could place it on the

other leg," which Hasan agreed to do.  Id.  After speaking with Hasan's counsel over the phone,

the case manager informed Hasan and his attorney that "ICE agents were on their way to the

ISAP office and assured Counsel that they would speak to her when they arrived."  Id. at 8.

Instead, the ICE agents "marched into the room, sharply told Mr. Hasan to stand up, aggressively

arrested him and shoved him into their car."  Id.  The agents refused to let Hasan speak with his

attorney, and when Hasan "explained that he was just asking for the ankle monitor to be put on

the other leg . . . the officer told him it was 'too late.'"  Id.

According to the federal respondents, Hasan "complained about discomfort from the

ankle monitor."  [Dkt. No. 9] at 7.  When "ICE offered to re-install the monitor on the other

ankle," Hasan "was unwilling to cooperate."  Id.  Because of Hasan's non-compliance, "it was

determined that he would remain in custody pending his immigration proceedings."  Id.

Accordingly, ICE agents detained Hasan.  Id.

ICE did not set bond after arresting Hasan. [Dkt. No. 1] at 8.  Instead, on August 6, 2025,

Hasan filed a Motion for Custody Redetermination requesting that an IJ review his custody

status.  Id.; [Dkt. No. 9] at 7.  At the hearing before the IJ on August 13, 2025, DHS asserted for

the first time that Hasan was an "applicant for admission" and was therefore subject to

mandatory detention under 8 U.S.C. § 1225(b)(2), which does not provide for the opportunity to

post bond. [Dkt. No. 1] at 9.  Hasan countered that position, arguing that because "DHS's own

4

evidence," including the NTA, "showed that he entered without inspection and could not therefore be considered an applicant for admission," his detention was instead governed by 8 U.S.C. § 1226(a)." Id. at 9–10. After finding that Hasan was detained under § 1226(a) and concluding that she had jurisdiction to conduct bond proceedings, the IJ granted Hasan bond in the amount of $1,500, the statutory minimum.[5] [Dkt. No. 1-4].

Before Hasan could be released on bond, ICE filed a Form EOIR-43, Notice of Intent to Appeal Custody Redetermination, which automatically stayed the IJ's bond order pursuant to 8 C.F.R. § 1003.19(i)(2). [Dkt. No. 1] at 11. ICE perfected the form by filing a notice of appeal on August 25, 2025. [Dkt. No. 9] at 8. Hasan—who has no criminal history—has remained detained at the FDC. [Dkt. No. 1] at 1; [Dkt. No. 1-5] at 2.

Hasan filed his Petition for Writ of Habeas Corpus on August 27, 2025. [Dkt. No. 1]. This Court subsequently entered an Order requiring that Hasan not "be removed or transferred from this district for any reason without this Court's permission." [Dkt. No. 4]. On September 3, 2025, Hasan filed a Proposed Response Plan, which explains that, upon release, he will "live with his friend, Sheerali Abdulrahimzai, a United States citizen, at 72 Horse Path Drive, Charlottesville VA."[6] [Dkt. No. 7] at 1. The federal respondents filed a Memorandum in Opposition to the Petition for a Writ of Habeas Corpus, and Hasan filed a reply. [Dkt. No. 9]; [Dkt. No. 11-2].

---

[5] 8 U.S.C. § 1226(a)(2)(A) provides that, after arresting and detaining a noncitizen, the Attorney General may "release the alien" pending a removal decision "on bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General."

[6] Abdulrahimzai submitted a letter to the Court explaining that he would be "happy to host" Hasan and help "ensure that he attends all court hearings and necessary ICE and ISAP appointments." [Dkt. No. 7-1].

## II. ANALYSIS

A. <u>Jurisdiction</u>

As a threshold matter, the federal respondents argue that this Court lacks jurisdiction to review Hasan's claims. First, they argue that Hasan must challenge "his detention in immigration court, not in federal district court." [Dkt. No. 9] at 10. The federal respondents base this argument on 8 U.S.C. § 1252(b)(9), which "consolidates review of matters arising from removal proceedings 'only in judicial review of a final order under this section,' and strips courts of habeas jurisdiction over such matters." <u>Afanwi v. Mukasey</u>, 526 F.3d 788, 796 (4th Cir. 2008) (quoting 8 U.S.C. § 1252(b)(9)). Second, the federal respondents argue that 8 U.S.C. § 1252(g) "specifically deprives" this Court of habeas jurisdiction to review Hasan's claims. [Dkt. No. 9] at 10.

A district court may grant a writ of habeas corpus to any person who demonstrates he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." <u>INS v. St. Cyr</u>, 533 U.S. 289, 301 (2001); <u>see</u> <u>Munaf v. Geren</u>, 553 U.S. 674, 693 (2008) ("Habeas is at its core a remedy for unlawful executive detention."). In the immigration context, habeas is "regularly invoked on behalf of noncitizens." <u>St. Cyr</u>, 533 U.S. at 305.

Although the federal respondents are correct that the INA and the Real ID Act contain jurisdiction-stripping provisions, these provisions "do not eliminate habeas jurisdiction over all immigration-related detention claims." <u>Aditya W.H. v. Trump</u>, 782 F. Supp. 3d 691, 704

(D. Minn. 2025).  As discussed below, the statutes on which the federal respondents rely do not divest this Court of jurisdiction to address the issues Hasan raises.[7]

The federal respondents first rely on 8 U.S.C. § 1252(b)(9) in support of their jurisdictional challenge, arguing that jurisdiction over Hasan's challenge to his detention lies with the immigration court, not with this Court.  [Dkt. No. 9] at 9–10.  Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).

Section 1252(b)(9) does not insulate detention orders from judicial review because they are "separate and apart from" orders of removal.  8 C.F.R. § 1003.19(d).  As the Supreme Court has explained, where a petitioner is "not asking for review of an order of removal" or "challenging any part of the process by which their removability will be determined . . . , § 1252(b)(9) does not present a jurisdictional bar."  Jennings v. Rodriguez, 583 U.S. 281, 294 (2018).

Hasan does not challenge a removal order; in fact, no order of removal has been entered against him.  [Dkt. No. 11-2] at 4.  Rather, Hasan challenges his detention, which is "separate

---

[7] Federal courts throughout the country have similarly found that these jurisdiction-stripping provisions do not deprive the federal courts of jurisdiction to review a noncitizen's challenge to the legality of his detention.  See, e.g., Ozturk v. Hyde, 136 F.4th 382, 394–401 (2d Cir. 2025); Nadarajah v. Gonzales, 443 F.3d 1069, 1075–76 (9th Cir. 2006); Hernandez v. Gonzales, 424 F.3d 42, 42 (1st Cir. 2005); Mohammed H. v. Trump, 2025 WL 1692739, at *2 (D. Minn. June 7, 2025); Aditya W.H. v. Trump, 782 F. Supp. 3d 691, 703–06 (D. Minn. 2025); Mahdawi v. Trump, 781 F. Supp. 3d 214, 224–28 (D. Vt. 2025).

and apart from . . . any deportation or removal hearing or proceeding." 8 C.F.R. § 1003.19(d).

Accordingly, § 1252(b)(9) does not prohibit this Court from considering Hasan's Petition.

 The federal respondents also rely on 8 U.S.C. § 1252(g) in support of their jurisdictional

challenge, arguing that § 1252(g) "specifically deprives courts of jurisdiction, including habeas

jurisdiction, to review 'any cause or claim by or on behalf of any alien arising from the decision

or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3]

execute removal orders against any alien under this chapter.'" [Dkt. No. 9] at 10 (quoting 8

U.S.C. § 1252(g)).

 Section 1252(g) has a narrow reach. In <u>Reno v. American-Arab Anti-Discrimination</u>

<u>Committee</u>, the Supreme Court explained that § 1252(g)'s jurisdictional bar applies only to the

commencement of removal proceedings, adjudication of removal proceedings, and execution of

removal orders. 525 U.S. 471, 482 (1999). The Court found it "implausible that the mention of

three discrete events along the road to deportation was a shorthand way of referring to all claims

arising from deportation proceedings." <u>Id.</u> The Court has since reaffirmed this narrow

construction, explaining that the <u>Reno</u> Court "did not interpret [§ 1252(g)] to sweep in any claim

that can technically be said to 'arise from' the three listed actions of the Attorney General."

<u>Jennings</u>, 583 U.S. at 294. The Court then clarified that it instead reads the statutory "language

to refer to just those three specific actions themselves." <u>Id.</u>

 Hasan does not challenge the commencement of removal proceedings, the adjudication of

removal proceedings, or the execution of removal orders, and as stated previously, no removal

proceedings have begun, been adjudicated, or resulted in any removal orders executed against

Hasan. His claim is not tied to a decision to commence removal proceedings because Hasan

received his NTA—the document that initiates removal proceedings—ten months ago. <u>See</u>

Maldonado v. Olson, 2025 WL 2374411, at *6 (D. Minn. Aug. 15, 2025) (finding that a habeas petition does not challenge the commencement of removal proceedings where "such proceedings were commenced long ago"). His claim is not tethered to the adjudication of removal proceedings because no such adjudication has occurred. [Dkt. No. 11-2] at 4; see Mohammed H. v. Trump, 2025 WL 1692739, at *2 (D. Minn. June 7, 2025) (finding no jurisdictional bar where petitioner "is not seeking to pause or end his removal proceedings"). And Hasan's claim is not related to the execution of a removal order because no such order has been issued against him. [Dkt. No. 11-2] at 4. Instead, Hasan contends that his continued detention pursuant to the automatic stay regulation violates his due process rights under the Fifth Amendment. Because Hasan's custody proceedings are "independent of, and collateral to, the removal process," Ozturk v. Hyde, 136 F.4th 382, 397 (2d Cir. 2025), § 1252(g) does not serve as a jurisdictional bar. Accordingly, the Court finds that it possesses jurisdiction to entertain Hasan's Petition to the extent he challenges the constitutionality of his detention.

## B. Mandatory or Discretionary Detention

Turning to the legality of Hasan's detention, the Court must first determine whether his detention is governed by the mandatory detention provisions in 8 U.S.C. § 1225(b)(2) or the discretionary detention provisions in 8 U.S.C. § 1226(a). See Rodriguez v. Bostock, 779 F. Supp. 3d 1239, 1247 (W.D. Wash. 2025) (explaining that "noncitizens detained under Section 1225(b)(2) must remain in custody for the duration of their removal proceedings, while those detained under Section 1226(a) are entitled to a bond hearing before an IJ at any time before entry of a final removal order"). The federal respondents argue that Hasan is an applicant for admission and therefore falls within the mandatory provisions of § 1225(b)(2). Hasan argues— and the IJ found—that the federal respondents have detained him under § 1226(a).

9

Section 1225(a) provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C. § 1225(a)(1).  Applicants for admission are divided into two categories: those covered by § 1225(b)(1) and those covered by § 1225(b)(2).  See Jennings, 583 U.S. at 287.  Section 1225(b)(1) applies to aliens "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation," id. (citing 8 U.S.C. § 1225(b)(1)(A)(i)), as well as to other aliens who receive special designation by the Attorney General, 8 U.S.C. § 1225(b)(1)(A)(iii).  Section 1225(b)(2) applies to all other applicants.  See Jennings, 583 U.S. at 287 (explaining that § 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)").

Both § 1225(b)(1) and (b)(2) require the detention of persons deemed to be applicants for admission.  Applicants for admission covered by § 1225(b)(1) are removed "without further hearing or review" pursuant to an expedited removal process unless the person "indicates either an intention to apply for asylum . . . or a fear of persecution," in which case that person is referred for an asylum interview.  8 U.S.C. § 1225(b)(1)(A)(i)–(ii).  "If an immigration officer determines after that interview that the alien has a credible fear of persecution, 'the alien shall be detained for further consideration of the application for asylum.'"  Jennings, 583 U.S. at 287 (quoting 8 U.S.C. § 1225(b)(1)(B)(ii)).  Persons who make no such claims or are "found not to have such a fear" "shall be detained . . . until removed."  8 U.S.C. § 1225(b)(1)(A)(ii), (B)(iii)(IV).

Applicants for admission covered by § 1225(b)(2) are detained pursuant to different processes.  They "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond doubt entitled to be admitted" into the United

10

States. Id. § 1225(b)(2)(A).  Overall, "[b]oth provisions require that any applicant for admission remain detained until their asylum application is fully adjudicated or until removal proceedings conclude." Olaya Rodriguez v. Bondi, 2025 WL 2490670, at *2 (E.D. Va. June 24, 2025).

Despite § 1225(b)'s mandatory detention provisions, an applicant for admission "may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.'" See Jennings, 583 U.S. at 288 (quoting 8 U.S.C. § 1182(d)(5)(A)).  This parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A).  Rather, once the purposes of parole have been served, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Id.

In contrast with § 1225(b), § 1226(a) sets forth "the default rule" for detaining and removing aliens "already present in the United States." Jennings, 583 U.S. at 303; see Abreu v. Crawford, 2025 WL 51475, at *3 (E.D. Va Jan. 8, 2025) ("There is a statutory distinction between noncitizens who are detained upon arrival into the United States and those who are detained after they have already entered the country, legally or otherwise.").  Section 1226(a) provides that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).  Pending the removal decision, the Attorney General may "continue to detain the arrested alien," "release the alien on bond of at least $1,500," or "release the alien on conditional parole." Id. § 1226(a)(1)–(2).  Section 1226(c) contains several exceptions for persons "who fall[] into one of the enumerated categories involving criminal offenses and terrorist activities." Jennings, 583 U.S. at 303.  Individuals who fall under § 1226(c)'s exceptions "shall" be taken into custody and may be released "'only if the Attorney General

11

decides' both that doing so is necessary for witness-protection purposes and that the alien will

not pose a danger or flight risk." Id. (citing 8 U.S.C. § 1226(c)(1), (c)(4)).

The federal respondents contend that a person must have "lawful status" to be detained

under § 1226(a). [Dkt. No. 9] at 14–15. This argument is rooted in a misinterpretation of this

Court's Memorandum Opinion in Rodriguez v. Perry, 747 F. Supp. 3d 911 (E.D. Va. 2024). At

issue in Rodriguez was whether petitioner Jordi Sandoval Rodriguez's ("Sandoval") Special

Immigrant Juvenile ("SIJ") status converted him from being an "arriving alien" subject to

§ 1225(b)(2) to an "alien present in the United States" subject to § 1226(a). Id. at 915–16.

When eight-year-old Sandoval arrived in the United States in 2013, he was placed into removal

proceedings as an "arriving alien," id. at 914, meaning that he was subject to mandatory

detention under § 1225(b)(2), id. at 916. He was then transferred to the Office of Refugee

Resettlement and reunited with his family in New York. Id. at 914. He also received SIJ status,

which "gives significant benefits and procedural protections to alien children." Id. at 916. In

2023, after Sandoval was arrested by ICE and placed into removal proceedings, an IJ denied his

request for a bond hearing on the basis that she lacked jurisdiction because Sandoval had been

designated as an "arriving alien" under § 1225(b), albeit 10 years prior. Id. Sandoval then filed

a habeas petition in this Court, arguing that he was entitled to an individualized bond hearing

before an IJ. Id. This Court agreed and granted his petition. Id. at 921.

The Court began its analysis with the statutory framework, explaining that § 1225

"applies to 'arriving aliens'" whereas "§ 1226 generally governs the process of arresting and

detaining aliens present in the United States pending their removal." Id. at 916 (citing Jennings,

583 U.S. at 288). Applying that framework, the Court found that, although Sandoval was

originally subject to mandatory detention under § 1225(b)(2), his SIJ status "converted him from

12

being an arriving alien to an alien present in the United States," meaning that he was entitled to an individualized "bond hearing . . . under § 1226(a)." Id.[8]

Unfortunately, courts in this district have misread Rodriguez to stand for the proposition that "[s]ection 1226(a) protections cover individuals given legal status who are then subsequently placed into removal proceedings." Olaya Rodriguez v. Bondi, 2025 WL 2490670, at *3 n.10 (E.D. Va. June 24, 2025); Romero v. Bondi, 2025 WL 2490659, at *3 (E.D. Va. July 2, 2025). Rodriguez does not stand for that proposition. In Rodriguez, this Court found that Sandoval's SIJ status meant that he was no longer an "arriving alien" under § 1225(b)(2) but rather an "alien present in the United States" and therefore subject to § 1226(a). 747 F. Supp. 3d at 916. The Court did not hold that § 1226(a) applies only to individuals with lawful status.[9] Indeed, such a holding would lack both statutory and precedential basis. Section 1226(a) does not contain a requirement of lawful status, and "courts are not free to read into the language [of a statute] what is not there." O'Hara v. Nika Techs., Inc., 878 F.3d 470, 475 (4th Cir. 2017) (quoting United States v. Murphy, 35 F.3d 143, 145 (4th Cir. 1994)); see Romag Fasteners, Inc. v. Fossil, Inc., 590 U.S. 212, 215 (2020) ("Nor does this Court usually read into statutes words that aren't there."). Moreover, the Supreme Court has characterized § 1226(a) as the "default rule"

---

[8] Abreu v. Crawford, 2025 WL 51475 (E.D. Va. Jan. 8, 2025), followed a similar analysis. Abreu involved a petitioner who was "initially detained pursuant to § 1225" and was subsequently paroled into the United States pursuant to § 1182(d)(5)(A). Id. at *3–4. Because his parole did not change his "arriving alien" status, the court found that he was still subject to mandatory detention under § 1225. Id. at *4. The court distinguished Rodriguez, where the petitioner's "arriving alien" status had changed because the petitioner was granted SIJ status. Id.

[9] Similarly, Abreu held that, because the petitioner was still classified as an "arriving alien," his mandatory detention had not converted to discretionary detention under § 1226(a) like it had in Rodriguez. Abreu, 2025 WL 51475, at *3. Abreu did not hold that lawful status is a prerequisite for an individualized bond hearing pursuant to § 1226(a).

governing any "alien already present in the United States." <u>Jennings</u>, 583 U.S. at 303.  The

Court has not imposed a requirement of legal status for § 1226(a) to apply.  Accordingly, this

Court rejects the federal respondents' argument that § 1226(a) cannot govern Hasan's detention

simply because Hasan lacks legal status.

Turning to Hasan's status, the federal respondents contend that he is detained pursuant to

§ 1225(b)(2) because he entered into the United States without inspection, making him

inadmissible under 8 U.S.C. § 1182(a).  [Dkt. No. 9] at 13–15.  And because "[p]etitioner has not

been admitted, as a legal matter" into the United States, he is "still considered an 'applicant for

admission.'"  <u>Id.</u> at 13 (quoting 8 U.S.C. § 1225(b)(2)).  This argument fails for several reasons.

First, the federal respondents' treatment of Hasan since he arrived in the United States

unequivocally demonstrates he is detained pursuant to § 1226(a).  Hasan entered the United

States without inspection on November 4, 2024.  [Dkt. No. 1-5] at 1.  Later that day, Border

Patrol agents arrested Hasan pursuant to an administrative warrant, which stated that he was

"within the country in violation of the immigration laws and is therefore liable to being taken

into custody as authorized by <u>section 236</u> of the Immigration and Nationality Act."  <u>Id.</u> at 1–2;

[Dkt. No. 1-7] (emphasis added).  DHS released Hasan from custody one day later, on November

5, 2024, pursuant to an ICE Form I-200A Order of Release on Recognizance, which provided

that, "[i]n accordance with <u>section 236</u> of the Immigration and Nationality Act and the applicable

provisions of Title 8 of the Code of Federal Regulations," Hasan was being released on his "own

recognizance."  [Dkt. No. 1-6] (emphasis added).  No monetary bond or ankle monitor was

required.  Finally, when ICE agents detained Hasan on July 22, 2025, they rearrested him under

the original DHS administrative warrant that had been issued pursuant to § 1226(a).  <u>See</u> 8

U.S.C. § 1226(b) ("The Attorney General at any time may revoke a bond or parole authorized

14

under subsection (a), rearrest the alien under the original warrant, and detain the alien."). In sum, all of ICE's actions against Hasan—including his initial detention, release, and rearrest—were done explicitly pursuant to § 1226(a).

The federal respondents contend that "[p]etitioner's release from custody has no bearing on his mandatory detention" because "the Secretary may for urgent humanitarian reasons or significant public benefit temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2)." [Dkt. No. 9] at 14 (internal quotations and citation omitted). According to the federal respondents, "ICE provided such parole here when it released Petitioner on November 5, 2024." Id. Besides failing to explain why none of Hasan's paperwork includes any reference to him being paroled into the United States or citing § 1225(b)(1) or (b)(2), that argument fails to explain Hasan's release on recognizance. Individuals detained under § 1225(b) can be paroled into the United States only "for urgent humanitarian reasons or significant public benefit." Jennings, 583 U.S. at 300 (quoting 8 U.S.C. § 1182(d)(5)(A)); see Biden v. Texas, 597 U.S. 785, 806 (2022) (explaining that DHS's authority to parole applicants for admission is "not unbounded" because "DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit'" (quoting 8 U.S.C. § 1182(d)(5)(A))). "Release on recognizance is not a 'humanitarian' or 'public benefit' 'parole into the United States' under section 1182(d)(5)(A) but rather a form of 'conditional parole' from detention upon a charge of removability, authorized under section 1226." Martinez v. Hyde, 2025 WL 2084238, at *3 (D. Mass. July 24, 2025); see Ortega-Cervantes v. Gonzales, 501 F.3d 1111, 1115–16 (9th Cir. 2007) (distinguishing between being paroled into the United States under § 1182(d)(5)(A) and being released on recognizance under § 1226(a)); Cruz-Miguel v. Holder, 650 F.3d 189, 191 (2d Cir. 2011) (same).

15

This distinction reflects more than an immigration officer's mere choice of paperwork. Release on recognizance pursuant to § 1226(a)(2)(B) is "legally distinct" from parole into the United States pursuant to § 1182(d)(5)(A).  Matter of Cabrera-Fernandez, 28 I&N Dec. 747, 749 (BIA 2023).  On one hand, parole into the United States under § 1182(d)(5)(A) "permits a noncitizen to physically enter the country, subject to a reservation of rights by the Government that it may continue to treat the non-citizen 'as if stopped at the border.'" Martinez, 2025 WL 2084238, at *3 (quoting Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 139 (2020)). On the other hand, conditional parole—including release on recognizance—releases a noncitizen already in the country from domestic detention.  Thuraissigiam, 591 U.S. at 139.  This means that persons paroled into the United States are in a fundamentally different and less protected position than "those who are within the United States after an entry, irrespective of its legality." Leng May Ma v. Barber, 357 U.S. 185, 187 (1958).  Given the significant distinction between being paroled into the United States under § 1182(d)(5)(A) and being released on recognizance under § 1226(a)(2)(B), DHS's consistent citations to § 1226(a) on Hasan's paperwork does not support the argument that the federal respondents actually intended for him to be paroled into the United States pursuant to § 1182(d)(5)(A).

Second, the federal respondents' view of this case fails to take account of traditional tools of statutory construction.  They maintain that, apart from those noncitizens who fall under § 1225(b)(1), essentially all arriving aliens and all aliens already in the United States fall under § 1225(b)(2), which subjects them to mandatory detention.  In other words, the federal respondents seem to believe that detention is mandatory for nearly every noncitizen who has entered the United States illegally.

16

One of the "most basic interpretive canons" is that "a statute should be construed so that effect is given to all its provisions," and "no part will be inoperative or superfluous, void or insignificant." Corley v. United States, 556 U.S. 303, 314 (2009) (cleaned up). If an interpretation of one provision "would render another provision superfluous," courts presume that interpretation is incorrect. Bilski v. Kappos, 561 U.S. 593, 607–08 (2010). This presumption is "strongest when an interpretation would render superfluous another part of the same statutory scheme." Marx v. Gen. Rev. Corp., 568 U.S. 371, 386 (2013).

If the federal respondents are correct that § 1225(b)'s mandatory detention provisions apply to all persons who have not been admitted into the United States, that would render superfluous those provisions of § 1226 that apply to certain categories of inadmissible aliens, such as § 1226(c)(1)(A), (D), and (E). For example, § 1226(c)(1)(A) provides that the "Attorney General shall take into custody any alien who is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title," such as crimes of moral turpitude and offenses relating to controlled substances. 8 U.S.C. § 1226(c)(1)(A). This mandatory detention under § 1226(c) would be unnecessary if all persons who have not been admitted into the United States were already subject to § 1225(b)'s mandatory detention provisions. See Rodriguez, 779 F. Supp. 3d at 1258 (applying a similar analysis to § 1225(c)(1)(E)); Espinoza v. Kaiser, 2025 WL 2581185, at *10 n.11 (E.D. Cal. Sept. 5, 2025) (same). In sum, the federal respondents' interpretation is presumptively wrong, particularly given that §§ 1225 and 1226 were enacted as part of the same statutory scheme.

Third, the federal respondents' theory contradicts how the Supreme Court has traditionally construed the relationship between §§ 1225(b) and 1226(a). In Jennings, the Court explained that § 1225(b) governs "aliens seeking admission into the country" whereas § 1226(a)

17

governs "aliens already in the country" who are subject to removal proceedings.  583 U.S. at

289.  This distinction makes sense in the broader context of U.S. immigration law.  Indeed,

"[t]he distinction between an alien who has effected an entry into the United States and one who

has never entered runs throughout immigration law."  Zadvydas v. Davis, 533 U.S. 678, 693

(1983)); see Leng May Ma, 357 U.S. at 187 ("[O]ur immigration laws have long made a

distinction between those aliens who have come to our shores seeking admission . . . and those

who are within the United States after an entry, irrespective of its legality.").  For those who have

already entered to United States, "the Court has recognized additional rights and privileges not

extended to those in the former category who are merely 'on the threshold of initial entry.'"

Leng May Ma, 357 U.S. at 187 (citation omitted).  Against this backdrop, it is doubtful that

Congress intended § 1225(b)(2) to apply to persons like Hasan who were detained after being

present in the United States for several months, who had not committed any crimes, and who had

attended every required meeting with immigration officials.

      Finally, the federal respondents' approach attempts to upend decades of immigration

practice.  Before July 8, 2025, "DHS's long-standing interpretation has been that § 1226(a)

applie[d] to those who have crossed the border between ports of entry and are shortly thereafter

apprehended."  Transcript of Oral Argument at 44:24–45:2, Biden v. Texas, 597 U.S. 785 (2022)

(No. 21-954) (quoting the Solicitor General).  Mandatory detention of all persons illegally in the

United States only became official DHS policy when Acting Director of ICE Todd M. Lyons

issued an internal memorandum explaining that the agency "revisited its legal position" on the

applicability of §§ 1225(b) and 1226(a).[10] <u>Martinez</u>, 2025 WL 2084238, at \*4; <u>Herrera v. Knight</u>, 2025 WL 2581792, at \*2–3 (D. Nev. Sept. 5, 2025). DHS's longstanding practice of applying § 1226(a) to persons apprehended shortly after crossing the border—"like any other interpretive aid—can inform a court's determination of what the law is." <u>Loper Bright Enter. v. Raimondo</u>, 603 U.S. 369, 386 (2024) (cleaned up).

For all these reasons, the Court agrees with the IJ who entered Hasan's release order and finds that Hasan's detention is governed by § 1226(a)'s discretionary framework, not § 1225(b)'s mandatory detention procedures.[11]

C. <u>Automatic Stay</u>

Having determined that § 1226(a) governs Hasan's detention, the Court will now consider whether DHS's invocation of the automatic stay pursuant to 8 C.F.R. § 1003.19(i)(2) violated Hasan's substantive and procedural due process rights under the Fifth Amendment to the U.S. Constitution.[12]

---

[10] This new interpretation will "require the detention of millions of immigrants currently residing in the United States." <u>Martinez</u>, 2025 WL 2084238, at \*5.

[11] The federal respondents mention <u>Matter of Q. Li</u>, 29 I&N Dec. 66 (BIA 2025), which held that noncitizens who unlawfully enter the United States and are detained without a warrant are considered applicants for admission subject to § 1225(b)(2)(A). Any reliance on <u>Matter of Q. Li</u> is misplaced because Hasan, unlike the petitioner in <u>Matter of Q. Li</u>, was detained pursuant to a DHS administrative warrant. <u>See</u> [Dkt. No. 1-7]. Moreover, this Court owes little deference to the BIA's interpretation of the INA. <u>See Loper Bright Enter.</u>, 603 U.S. at 412.

[12] The federal respondents dedicate a substantial portion of their brief to arguing that the process due to persons subject to mandatory detention under § 1225(b)(2) is limited to the process afforded by the INA. [Dkt. No. 9] at 16–20. This argument does not apply to the Court's due process analysis because Hasan has already been found detained pursuant to § 1226(a), not § 1225(b)(2).

8 C.F.R. § 1003.19(i)(2) provides that "[i]n any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more, any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order." The "automatic stay shall lapse 90 days after the filing of the notice of appeal" if the Board of Immigration Appeals ("BIA") has not acted on the appeal. Id. § 1003.6(c)(4). If the noncitizen requests an enlargement of the BIA's 21-day briefing schedule, the 90 days is tolled. Id. DHS may also seek a discretionary stay after the automatic stay has elapsed, id. § 1003.19(i)(1), which results in an additional 30-day extension, id. § 1003.6(c)(5). If the BIA fails to act on DHS's discretionary stay request, "the alien's release shall be automatically stayed for five business days." Id. § 1003.6(d). If during those five days DHS refers the case to the Attorney General, "[t]he automatic stay will expire 15 business days after the case is referred to the Attorney General." Id. All told, the automatic stay regulation can hold an individual in custody for approximately 140 days after the IJ's initial bond determination.

At the outset, this Court recognizes the need to carefully distinguish between "the substantive power of the Executive branch over immigration issues, an area in which it indeed has plenary power, and the means the government has chosen to exercise that plenary power to which no executive deference is necessary." Ashley v. Ridge, 288 F. Supp. 2d 662, 667 (D.N.J. 2003) (citing Zadvydas, 533 U.S. at 695). Having full appreciation for this delicate balance, this Court will address each of Hasan's Fifth Amendment claims in turn.

In Count II, Hasan claims that the automatic stay regulation violates his substantive due process rights. [Dkt. No. 1] at 23–26. The Fifth Amendment provides that "[n]o person shall

20

be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. This guarantee includes a substantive component that mandates the application of strict scrutiny whenever the government infringes on fundamental liberty interests, regardless of what process the government provides. Reno v. Flores, 507 U.S. 292, 302 (1993). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." Zadvydas, 533 U.S. at 690. "[G]overnment detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections or, in certain special and narrow nonpunitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. (cleaned up). This guarantee extends to noncitizens present in the United States.[13] Id. at 693.

The federal respondents have not provided any special justification to deny Hasan the liberty that the IJ ordered subject to his posting a $1,500 bond, which his counsel is ready to post. Any interest that the federal respondents may have in securing Hasan's presence at immigration proceedings has been accounted for by the IJ's imposition of bond. See Leal-Hernandez v. Noem, 2025 WL 2430025, at *13 (D. Md. Aug. 24, 2025) (finding that flight risk

---

[13] The federal respondents claim that "[b]ecause the Petitioner lacks a fundamental right to be in the U.S., Petitioner's substantive due process claim fails." [Dkt. No. 9] at 20. This argument fails because "the government's discretion to incarcerate non-citizens has always been constrained by the requirements of due process." Hernandez v. Sessions, 872 F.3d 976, 981 (9th Cir. 2017); see Zadvydas, 533 U.S. at 693 (explaining that the guarantee of substantive due process "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"); United States v. Lopez-Collazo, 824 F.3d 453, 461 (4th Cir. 2016) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." (quoting Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953))).

concerns were accounted for by the IJ's imposition of a $10,000 bond on the petitioner's release). Hasan has also demonstrated that he does not pose a flight risk, given that he attended both scheduled ICE meetings and did not object to wearing an ankle monitor. [Dkt. No. 1] at 6–8.

The federal respondents also do not contend that Hasan poses a threat to public safety, and ICE itself reported that Hasan "does not appear to be a threat to national security, border security, or public health." [Dkt. No. 1-5] at 2; see Ashley, 288 F. Supp. 2d at 669 (finding no threat to national security where petitioner had not been arrested for any crimes or accused of suspicious activity for nearly 10 years). Instead, "the automatic stay provision applies only in situations like here where an IJ has already determined an individual should be released on bond. The governmental interest in the continued detention of these least-dangerous individuals, in contravention of the order of a neutral fact-finder, does not outweigh the liberty interest at stake." Garcia Jimenez v. Kramer, 2025 WL 2374223, at *4 (D. Neb. Aug. 14, 2025).

Although the federal government possesses significant discretion in immigration matters, that does not mean it can overcome the "due process enshrined in the Constitution." Leal-Hernandez, 2025 WL 2430025, at *13. If enforced by the Court, the automatic stay regulation would destroy that due process by permitting unilateral governmental detention, even after an IJ made an individualized finding that a person did not pose a threat to the safety of others or a risk of flight. In essence, "the automatic stay provision renders the Immigration Judge's bail determination an empty gesture." Ashley, 288 F. Supp. 2d at 668. Accordingly, ICE's invocation of the automatic stay resulted in Hasan's arbitrary detention in violation of his Fifth Amendment substantive due process rights.

22

In Count III, Hasan claims that the automatic stay regulation violates his procedural due process rights. [Dkt. No. 1] at 26–28. To determine whether civil detention violates a detainee's Fifth Amendment procedural due process rights, courts apply the familiar three-part test articulated in Mathews v. Eldridge, 424 U.S. 319 (1976).[14] Under Mathews, courts weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335.

The first Mathews factor requires consideration of the private interests affected by the federal respondents' invocation of the automatic stay. "The interest in being free from physical detention" is "the most elemental of liberty interests." Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004); see United States v. Salerno, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention . . . is the carefully limited exception."). Hasan is not claiming a liberty interest in remaining in violation of United States immigration law, as the federal respondents argue. [Dkt. No. 9] at 23. Rather, Hasan is claiming a significant private interest in being free from the physical detention that the IJ found inappropriate. See Zadvydas, 533 U.S. at 690 (explaining that an individual's interest in being free from detention "lies at the heart of the liberty that [the Due Process] Clause protects").

---

[14] The Court need not consider the five-factor test outlined in Portillo v. Hott, 322 F. Supp. 3d 698, 707 (E.D. Va. 2018) because the Court finds that Hasan is detained pursuant to § 1226(a).

Moreover, when assessing the first Mathews factor, courts also consider the "conditions under which detainees are currently held, including whether the detainee is held in conditions indistinguishable from criminal incarceration." Günaydın v. Trump, 784 F. Supp. 3d 1175, 1187 (D. Minn. 2025). Hasan is being held at the FDC and "experiencing all the deprivations of incarceration," including mental health issues and lack of privacy. Id. For example, staff at the FDC reported that Hasan has been "very anxious" and "depressed" and expressed concern that Hasan will "not . . . be able to cope in the dorm." [Dkt. No. 14-1] at 16. Hasan has also been separated from his community ties in Charlottesville, which courts have found to be another "individualized harm[] attendant to . . . incarceration" relevant in evaluating whether the automatic stay regulation violates a petitioner's procedural due process rights. Herrera, 2025 WL 2581792, at *10. Accordingly, the first Mathews factor heavily supports Hasan's claim of a procedural due process violation.

The second Mathews factor requires courts to assess the risk of an erroneous deprivation of private interests and the degree to which alternative procedures could ameliorate that risk. The automatic stay provision creates a substantial risk of erroneous deprivation of Hasan's interest in being free from arbitrary confinement because invocation of the automatic stay fails to account for any individualized facts. Maldonado v. Olson, 2025 WL 2374411, at *13 (D. Minn. Aug. 15, 2025). Moreover, petitioners in Hasan's position face a particularly high risk of erroneous deprivation "because the only individuals adversely affected by this regulation are those detainees who have already prevailed in a judicial hearing." Günaydın, 784 F. Supp. 3d at 1187. Hasan prevailed before the IJ, but "the challenged regulation permits an agency official who is also a participant in the adversarial process to unilaterally override the immigration judge's decisions." Id. This regulation is an anomaly in this country's legal system and creates a

"patently unfair situation by taking the stay decision out of the hands of the judges altogether and giving it to the prosecutor who has by definition failed to persuade a judge in an adversary hearing that detention is justified." Ashley, 288 F. Supp. 2d at 671 (cleaned up); see Leal-Hernandez, 2025 WL 2430025, at *14 ("The automatic stay is a violent distortion of proper, legitimate process whereby the Government, as though by talisman, renders itself at once prosecutor and adjudicator."); Herrera, 2025 WL 2581792, at *11 (describing the automatic stay as creating a "conflict of interest").

As to the probable value of additional procedures, "it is not difficult to conclude that any additional procedure is valuable where, as here, the only procedure required for continued detention appears to be an agency official checking a box and filing a form." Herrera, 2025 WL 2581792, at *11. Moreover, the regulations contemplate two procedures DHS may use to contest an IJ's bond release order. DHS could request a discretionary stay from the BIA pursuant to 8 C.F.R. § 1003.19(i)(1), which requires the BIA to consider the individual circumstances and merits of the request. Id. DHS could also follow the normal appeal procedures to seek review of an IJ's adverse bond decision. See 8 C.F.R. § 1236.1(d)(3); Sampiao v. Hyde, 2025 WL 2607924, at *11 (D. Mass. Sept. 9, 2025) (explaining that the risk of erroneous deprivation could "be lessened if ICE were held to the same standard as a party seeking a stay pending appeal in federal court"). Both of these alternative procedures "cure[] the due process infirmities of § 1003.19(i)(2) while preserving the government's interest in preventing an erroneous release." Günaydın, 784 F. Supp. 3d at 1189. Because there is a high risk of an erroneous deprivation of private rights, and alternative procedures could alleviate those risks, the second Mathews factor supports Hasan's claim of a procedural due process violation.

The third and final <u>Mathews</u> factor requires courts to weigh the private interests at stake and the risk of erroneous deprivation of those interests against the federal respondents' interests in persisting with the automatic stay and the burdens of substitute procedures. The federal respondents assert that the enforcement of this country's immigration laws is "a vital public interest." [Dkt. No. 9] at 26 (quoting <u>Miranda v. Garland</u>, 34 F.4th 338, 364 (4th Cir. 2022)). Of course, "ensuring that persons subject to removal do not commit crimes or evade law enforcement is a significant governmental interest," <u>Maldonado</u>, 2025 WL 2374411, at *14, and the federal respondents correctly argue there "is always a public interest in the prompt execution of removal orders." [Dkt. No. 9] at 26 (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 436 (2009)). The Court finds, however, that these interests are adequately protected by the mandatory detention procedures outlined in §§ 1225(b) and 1226(c) and by the individualized determination of an IJ as to whether an individual should be released on bond under § 1226(a). As discussed above, Hasan clearly does not pose a flight risk or a risk to the public. <u>See</u> [Dkt. No. 1-5] at 2. And there is also currently no order of removal pending against Hasan, who is seeking asylum. In failing to articulate "why detaining noncitizens who have prevailed at a bond hearing is necessary to enforcing immigration law, the question arises 'whether the detention is not to facilitate deportation, or to protect against the risk of flight or dangerousness, but to incarcerate for other reasons.'" <u>Herrera</u>, 2025 WL 2581792 (quoting <u>Demore v. Kim</u>, 538 U.S. 510, 532–33 (2003) (Kennedy, J., concurring)).

Moreover, there is an extremely compelling public interest in protecting the fundamental principles of due process. In essence, the automatic stay imposed in immigration cases constitutes an unequivocal violation of due process. It is, in effect, no process at all.

Accordingly, the Court finds that all three <u>Mathews</u> factors support Hasan's claim that the automatic stay regulation violates his procedural due process rights.

### III.  CONCLUSION

For the reasons stated above, Hasan's Petition will be granted as to Counts II, III, and V by an Order to be issued with this Memorandum Opinion, which will require the respondents to immediately release Hasan from custody.

Entered this 19 day of September, 2025.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge